Our last case, Steilacoom Lake Improvement Club Inc., and I hope, did I pronounce that right, Steilacoom or Steilacoom? Steilacoom Lake. Steilacoom. Steilacoom Lake Improvement Club v. State of Washington and a cast of many others. So we appreciate all the interest in this important case. And we've set this for 20 minutes per side for argument. We have Mr. Ralph Close. Correct. On behalf of the appellants. And we have for the Department of Justice, Aaron Avila. Aaron Avila. And for the Pierce County, we have Daniel Hamilton. Thank you. And for the Attorney General for Washington State, we have Andrew Fitz. Yes. Okay. Well, we appreciate all the distinguished counsel here. So as you proceed with your argument, if you'd like to make a rebuttal argument, please stop short of using up the full 20 minutes and hold back some time. Thank you, Your Honor. I would try to reserve about five minutes for rebuttal. We'll try to remind you if we remember. But we kind of put the burden on the counsel to take their time. Understood. May it please the Court, my name is Ralph Close. I represent plaintiffs on this appeal. And before I launch into argument, I want to call attention to the court that Dan Hamilton, attorney for Pierce County, has just brought to my attention this morning, the case of Skokomish Indian Tribe v. United States, a U.S. Supreme Court that deals at least in part with the issue of causation, which is one of the issues we raise on this appeal. The issue of what? The issue of cause of the statute of limitations. I misspoke. It deals with statute of limitations, particularly with respect to contributing violations, which is one of the issues we raise. You mean the Ninth Circuit's in-bank opinion? Well, you must mean that, because that's what was filed in there. We just issued an in-bank opinion, which I am familiar with because I think I'm one of the members of that panel. I haven't forgotten. I didn't think the Supreme Court had launched into it so quickly. We're almost as good. I don't know about that. In many respects, you're better. Yeah. But we will take a look at that case on those issues. Okay. And so as is evident by my misciting the Court, I haven't had time to read it yet. I did briefly scan it. I don't believe that it changes this case, the result in this case. The opinion does cite Fradkin, which we rely on and cite, which stands for the proposition that that is an issue of fact, creating issue not for summary judgment. If I recall correctly, the debate in that case about the State statute of limitations is just a debate about what's reasonably abatable? Correct. It's not really altering or purporting to alter State law. Correct. Just applying that standard and the different opinions about what that means. Yes. And then whether something is abatable is typically a question of fact. Okay. So this case involves the pollution primarily by phosphorus of Stillicum Lake. The plaintiffs are the Stillicum Lake Improvement Club and several individual homeowners on the lake. The defendants are entities identified as having contributed to the pollution of the lake. The trial court dismissed all of plaintiffs' claims on summary judgment. And in doing so, the trial committed errors, three of which we bring to the attention of this Court. The first is that the trial court impermissibly weighed the evidence and expert testimony and also applied an incorrect legal standard regarding causation in doing so. Second, the trial court applied an incorrect legal standard regarding the statute of limitations, which we just briefly discussed, and also the trial court applied an incorrect legal standard regarding imminent and substantial endangerment under RCRA. Regarding the first issue and starting out with the causation, the defendants argued and the trial court ruled that there is no evidence that any phosphorus in the lake was specifically contributed by any defendant or that such specific phosphorus was the cause of the toxic condition of the lake and the injury to the plaintiffs. Under the correct legal standard, under Washington law, plaintiffs are not required to prove that any defendant was the proximate cause of the harm, but only that's. Just a minute. Now, when you say under Washington law, which claims or causes of action are you addressing? Because several of these claims are under Federal law. I wouldn't think they'd be governed by Washington law, right? Correct. The common law claims would be governed by Washington law. So you're just addressing the common law claims now? On that specific argument, yes. So under Rioja's case cited in our brief, plaintiffs must only prove that they are a proximate cause and you can have more than one proximate cause. Plaintiffs also are not required to prove that they would not have been injured, but for each defendant's actions, only required to prove that each defendant contributed to the condition that resulted in the injury. Isn't the difficulty that the district court was having with the evidentiary presentation something like this? A, you don't know what the background phosphorus is. Never mind these people. There may be enough phosphorus coming in just from nature through those creeks into this area that you'd have exactly the same blooms and such. So we don't have any idea what these people, that these people are causing the bloom in any proximate way, with or without them. It may be happening. I think that's one thing the Court said, because nobody bothered to actually figure out what are they contributing, why are they actually contributing anything that reaches the lake. That was not done, I gather. That's wrong and that's what we need to be pointing to is why that's wrong. I understand what your expert said about there's stuff coming out of the stream into the lake, but that's only half of the causation step it seems. Right. But the allocation or between the defendants as to how much phosphorus is contributed by each specific defendant, that's not the plaintiff's burden of proof. The plaintiff's burden of proof is only to show that each defendant is a contributor. Now, let me deal with it. But the question is, are they contributors at all to anything that's causing the problem? Right. So let me address that then. They also say, well, all of the phosphorus that you're measuring in the stream points, the expert measured higher phosphorus downstream of the defendant's facility than upstream of the facility and drew the conclusion that the actions taking place on that defendant's facility, i.e., the deposit of four tons of fertilizer by Pierce County on its part and the actions of the McCourt Air Force Base. Is there evidence that, indeed, the fertilizer phosphorus is leaving the land where it's placed and reaching the stream and then reaching the lake? Is there evidence of that specifically? Or is it just you guys scatter fertilizer and there's phosphorus in the stream? The phosphorus that you find in the lake does not come labeled as to where it came from and who put it. And it cannot, I don't think there is a practical way of being able to. No, but if I throw a bunch of fertilizer on here, on this table, you can't tell me it must have reached the lake. And my question is, is there evidence that says that phosphorus is reaching the stream even? Yes. Yes? Yes. To distinguish the phosphorus in the stream from being natural, the defense argument is this could all be natural and you haven't proved that any of the phosphorus is from any of our activities. The evidence we have is a core sample of boring from the bed of Lake Stilichem, which was done by the KCM study in 1996, which preceded this case. And the result of that core sample is that the accumulation of phosphorus over a 50-year period increased over the 50 years. If it had been natural accumulation, you would have seen a consistent increase in the accumulation of phosphorus. And because you saw an increase in the accumulation of phosphorus, the expert, the KCM report concluded and the expert concluded that the accumulation of phosphorus is due to. How do we know that if phosphorus increased, it must have been increased as a result of these people, human activity, in, for example, putting fertilizer on some part of the land, which may or may not be draining into the stream. How do I know, how do I know that any part of their fertilizer, for example, actually did reach the stream just because there's a phosphorus increase in the lake core? Your Honor, I don't know that anybody ever would know in the sense of absoluteness whether that occurred at any time. But it is a reasonable conclusion that an expert may make from the evidence that they do have, from the activities being conducted on the properties, from the measurements made of increase in phosphorus amounts upstream, downstream, and from the core study which show increases in accumulation over increasing periods of urbanization and human activity in the watershed. I mean, all of these facilities are within the watershed, and all of it drains to Distillicum Lake. So it's not too much of a stretch for an expert in this subject matter to conclude that if you apply some phosphorus or discharge some phosphorus within the watershed, it is going to make it through natural percolation and stream flow and what not drainage to the lake which sits at the bottom point. As I recall, your expert didn't designate any particular way that it even could have gotten there from the particular, assuming there were applications, from the particular application we're talking about to the stream. As I recall, your expert didn't even, I mean, you don't have to be an expert to say, oh, yeah, well, it must have gotten there. But as I recall, there was no mechanism. The provenance of the phosphorus found in the stream was never designated, and a mechanism for its reaching there was not designated either, was it? I'm not sure if I completely understand your question. But if I do, if you're looking for a specific- Well, you know, think of it this way. If I put this stuff here on this table- Right. And your expert walks into the district court and says, you know, that stuff reached the stream, I guess if I were a district court judge, I'd say, oh, yeah? How did that happen? Right. And he says, well, it must have because there was more phosphorus in the stream and Judge Fernandez put phosphorus on the table. Right. So it must have gotten there. So if your table is within the watershed and- Make it in the watershed. It's in the watershed. Uh-huh. Okay. And it drains to the stream, which flows to the lake. Well, that's what I'm asking. Okay. Where is the evidence that the stuff on my table in my house in the watershed got into a drainage system that went into the stream? Right. And that's what the expert says. It's on my table. It couldn't have gotten into the stream, into the lake. And the defendants also say just because I deposit four tons of fertilizer on my play fields, which is next to the stream, and when it rains on it, you know, where is it going to go? It's not going to go uphill. But they say maybe it just goes into the ground and it never arrives at your lake. Okay. That's their side of the argument. That is why you have competing experts and competing sides. And it creates an issue of fact properly triable by the trier effect. It's not something. It might. You know, so far as I can tell, you're only addressing the common law claims. But I think on the common law, because I think the causation test on the federal claim is much more strict. In other words, under the Clean Water Act, you have to show some violation of the NPDES permit. And then under record, you have to show something direct. And none of your argument so far in the last 13 minutes has gone to that. And then on the common law claims, you have these other problems. You have the problems of standing. You don't own the lake. So how can you claim crespass? You have these statute of limitations problems. And as far as I can tell, you know, your argument really hasn't addressed any of the issues that you face in this appeal. All you said so far is, you know, under under the common law, there's a very broad causation requirement. And we've met that. Let's assume you have. But about the other problems under the Clean Water Act, a violation of a an order or an effluent limitation or an NPDES permit sets up a violation of the law. And you need a point source. You don't need a point source. You can have non-point discharges. The NPDES permits held by these agencies all say that any discharges from the facility that affect water quality are violations of the Clean Water Act. And we have that under RCRA. You have a standard that says, what do you mean by we have that now? For instance, I mean, give me let's take McCord Air Force Base. How did they violate it? Where is the one that they've already violated their permit? And to that permit is approximately cause of the problems in the lake. And the permit says that you shall not violate water quality standards. And what's the standard? The water quality standard established for Stillicum Lake, which is referred to in the brief, is established by DOE, which has some specific characteristic narrative standards for the quality of the water. Those have been violated because you have an exceedance for phosphorus. You have an exceedance for dissolved oxygen. You don't have recreational use, aesthetic value. You have a lake that's choked with weeds and toxic algae blooms. And the Tacoma-Pierce County Health Department routinely comes out posted as toxic. And that's what you have there. That's not meeting state water quality standards. What's the causation? The causation gets back. What did McCord do? What's the evidence that McCord violated their NPDES permit? How did they violate their permit? What did they do? By the discharge of phosphorus to the stream as measured by. From where? From their facility. Or from, you know, washing their Jeeps or what? The testimony from the McCord witnesses, they identify they have airplane washes. They have vehicle washes. Aren't those recirculated into their water treatment system? Isn't that the evidence? Well, that's what they say. Is there any evidence to the contrary? Yes. There's an increase in phosphorus measured upstream to downstream of their facility. Well, that's, I mean, that's, you know, twice removed, you know, highly attenuated inference you want to draw. There's no evidence. Is there that, what were you talking about, leakage from the treatment plant or what? No, we don't have a tie to a specific, we don't have any direct evidence of a specific activity. You don't even have indirect evidence. Yes, we do. We have the expert testimony and the facts that he measured and his testimony based on the study of the available facts. He says that phosphorus coming in, but you don't know where it comes from. You don't even know whether it's natural or it's, Judge Bernanke says, caused by human activity. We have the case. As far as the one that comes from, again, we'll say McCord Air Force Base. No, we have the bore sample, which shows an increase in phosphorus over urbanization. But you don't know that that maybe I don't understand this fully. But if there's a difference in the phosphorus levels over time on the bed of the lake, I'm not sure that would necessarily. And if you had an increase of phosphorus, like more sediment with phosphorus while there was human habitation, I don't know that that would prove it was caused by that necessarily. I mean, it could be the climate's different or the plant levels are different because of Washington's becoming warmer or something. I mean, it may be that you can argue that, but it doesn't seem like it's in itself definitive evidence of that. Right. But remember where we are. We're here on summary judgment. We don't have to prove it. And all we have to do is have a fact and create an issue of fact. And we have a reasonable opinion by an expert in this field who draws conclusions based on these facts. You have to present sufficient evidence that a rational jury could so find. If you trot in some expert who who's got nothing except a couple of it says I found more phosphorus there and thus you must have it. I mean, one could easily say, you know, a rational juror and Brian had trouble with that. As I know, a rational juror couldn't find against these folks based on what that guy said. So it's not enough to say the guy says it. It's got to be evidence that would allow a rational juror to find in your favor. Right. And our position is that the case has presented that that it is reasonable and a juror could find. And what the judge here did, which is wrong, is that the judge says I'm not buying your experts conclusions and I'm going to make the decision that I don't believe it. And so I'm granting summary against you. And that's improper to do on summary judgment. Now, you wanted to reserve five minutes. We've got only two minutes left. So would you like to wait and keep that for rebuttal? Yes, I would, Your Honor. And for the rest of the arguments, we'll be relying on the brief. And we may add a few minutes to your time since they're ganging up with four of them and one of you. Thank you. But we'll give you a couple of extra minutes if you need it. Thank you. Mr. Avila. Yes. May it please the Court. Aaron Avila on behalf of the Federal Defendant's Appellees. I'll be addressing, as the Court hit on in the questioning of a plaintiff's counsel, there's just a lack of evidence in this case, and I'll be addressing that issue. That disposes of their Clean Water Act and RCRA Resource Conservation and Recovery Act citizenship claims, as well as all their state tort claims. When you say their claims, you're talking about you're just speaking on behalf of the United States or you're speaking for everyone? No, I will speak for everyone on those issues. Just want to be clear. Yes. And then Mr. Hamilton will address the more specific on the torts issues in the statute of limitations, and Mr. Fitts will address issues unique to the individual State Defendant. Let's assume that somebody puts a lot of fertilizer on a golf course and there's a creek running through the golf course or adjacent to it. And they irrigate or it rains. Is that sufficient to show a discharge of some chemical into the creek? Not in this case. There is no evidence. And, in fact, the expert testified that he had no knowledge as to all of these properties of the mechanisms of the nature of the activities that go on there, any mechanism that would get the phosphorus from any particular location to the creek. But he did know that, say, downstream, let's say McCord, there's more phosphorus than there is upstream. Right. Well, there is some sampling that indicates that. But there's any number of heat. They made no distinction between naturally occurring phosphorus. They don't. That could naturally come out of the plants. And there's no evidence that ties that to anything at McCord Air Force Base or with respect to all the other. You're saying downstream of the McCord Air Force Base, there could be heavier vegetation that could cause a higher phosphorus. Exactly, Your Honor. At least the record doesn't really address those issues. Doesn't he get the benefit of the doubt on summary judgment? No, Your Honor. They have to come forward with the evidence to establish their case. And they have not done that. I mean, I'd also note that with respect to they have no evidence as to what any of these defendants are contributing, if anything, to the creeks. By the way, the downstream was not measured, right? At the boundary between McCord and something else was measured even further downstream. Correct, Your Honor. And with respect to there is some talk about the Clean Water Act. You need to show the NPBS permit covers point source discharges. There has been no plaintiff's expert admitted that he did not attempt to distinguish between point source and non-point source discharges. McCord Air Force Base is a clean base. They use hangers to clean the airplanes. The wash water, as the court noted, is recycled, sent to a treatment plant. There is no evidence that any of these defendants are contributing phosphorus to any of these streams. With respect to the record claim, there's no evidence of a solid waste that's reaching the streams and eventually the lake. There's just a complete failure of evidence in this case. Well, isn't phosphorus be considered as always? You still have to show that it's dangerous chemical. Well, it's actually a naturally occurring chemical. I mean, as plaintiff's expert admitted, even if you took away all of the. This lake is a shallow man-made lake that was a wetland and wants to return to a wetland. And that's what the phosphorus does. Even if it's natural, though, if you go dump a bunch of diammonium phosphate or some natural chemical into a river or a lake, that can be a pollutant. There's a failure of proof on that. There is no evidence of a solid waste. A solid waste has to be discarded. There is no evidence of that. Is there anything that says that putting fertilizer on land is considered throwing away waste? No. And again. Is there anything that says that fertilizer is waste? No, there isn't. And there's no, again, there's no evidence that the fertilizer is reaching, at any of these facilities, is reaching the lake. Let alone, I mean, no evidence it's reaching the creek, let alone the lake. And unless the Court has any other questions, I would be happy to rest on the briefs. I don't have a question for the U.S. Thank you very much, Your Honors. Thank you, Mr. Avila. Good morning, Your Honors. I'm Dan Hamilton for Pierce County. I do, I've been designated the area of discussion regarding state torts, but I would like to also contribute to the issue of causation and specify it as to the county to show that when you actually look at the record, and I think this speaks for all the defendants, when you look at what plaintiffs say, you just can't find it in the record. There is no evidence. Let's look at just this issue of four tons of fertilizer, as they say. They ignore that this four tons of fertilizer, that there's only a small percentage of that that actually contains phosphorus, and that there's no evidence that it could ever get to the lake, much less ever has. In fact, the evidence is that this fertilizer is applied in smaller amounts and watered less than what the state agricultural department recommends. So we're actually doing less than what the authorities specify. Furthermore, this allegation of fertilizer, you can only find in a plaintiff's brief. Their expert, their supposed expert, makes no mention of county fertilizer at all. In fact, as the court has pointed out, and this is the attorney for the United States that pointed out, that their expert especially said that he didn't know such important things as the transport mechanisms, which he admitted he would have to know, and that, quote, we don't purport to have that information, end quote. So the court's been provided. It is not correct that the plaintiff gets the benefit of the doubt under the case law of the United States Supreme Court, such as fellow tax. They have the burden to show, as was pointed out, for a reasonable jury to be able to conclude in their favor, and they've come nowhere close to that. I'd like to deal quickly with the issues that deal with the state torts, now that you look beyond the issue of causation. Specifically, there are two theories that apply to all defendants and all torts. Those are the statute of limitations and prescriptive easement issues. And then go into the elements very quickly of the torts, because they essentially just gloss over that and ignore that essential elements of their state torts are just totally absent. As to the issue of statute of limitations, the ‑‑ it's undisputed that such things as the county facilities and the McCourt Air Force Base facilities all existed for decades, and the plaintiffs have known of their phosphorus problem for decades more. Now, plaintiffs allege because these are supposedly continuing torts, that the limitation period will only bars their claims beyond a certain date. Now, the problem with that is that they have a burden of proof there, which, again, is missing. They have to show that there is continuing torts. It's their burden. That's one of the reasons why the Skokomish Tribe case is cited, because that court, as Your Honor pointed out, essentially restates settled Washington law, which is that it's the burden of plaintiffs to prove the issue of whether a tort is continuing or not. Here, they have nothing at all. In fact, they want to rely on, well, it's defendants' burden to disprove that it's continuing tort, and that is not the law in Washington State. As to ‑‑ so the statute of limitations are complete bars. There is no exception to it under the continuing tort issue. As to prescriptive easement, even if it were a continuing tort, the State Supreme Court in Bradley said that a prescriptive easement will, quote, forever bar the landowner from recovering for the continuing activity of the polluter, end quote. And those elements of use, adverse, open, notorious knowledge, we've shown in our briefs how all of those elements are here. Now, plaintiffs argue that they have not known for the required 10‑year period what was the cause of these obvious problems. But once, as, again, the Skokomish Tribe case points out, once you are injured, you have a duty to start looking. They've known since at least 1949 that there was a problem. And, in fact, under the county's supplemental excerpts of record, page 42, we've cited the court to a document where they expressly start claiming that it is, quote, development in the watershed, end quote. And that was, again, decades before this lawsuit was filed. As to quickly covering the remaining specific torts and the elements of it, Your Honor has already pointed out that it's a trespass. You have to have a physical invasion, and they deny ownership of the lake. There's no claim that their property that they own is being invaded. So trespass is unavailable. And if there's any claim, like there is against the State, that they should have prevented something from happening, Washington law makes clear that you can't have an act under trespass, or as the court in Price v. Seattle said, an act as used in defining the elements of trespass does not include the failure to act. So you can't have a trespass by inactivity. As to the issue of negligence, it's already been pointed out that you have to have a duty, that there is no shown statutory violations here. And if there were, you'd have the public duty doctrine, which are a bar. Finally, as to the nuisance, they allege a statutory nuisance, but this requires unlawfully doing an act or omitting to perform a duty, and they have shown no unlawful act by any of the defendants. And furthermore, RCW 7.48.160, part of the public nuisance statutes, makes clear that, quote, nothing which is done or maintained under the express authority of a statute can be deemed a nuisance, end quote. And, for instance, the county is expressly authorized to maintain golf courses and parks under RCW 36.68.090. So in short, Your Honor, whether the – Your Honors, whether the court wants to look at the issue of causation, whether it wants to look at the specific elements of the torts, whether the court wants to look at the overarching bar of the statute of limitations or prescriptive easement, plaintiffs come nowhere near meeting their burden under the Celotex case to overcome summary judgment. Thank you, Your Honors. Thank you. Good morning, Your Honors. I'm Andy Fitz from the State Attorney General's Office on behalf of the four individual state defendants. And despite the caption in this case, of the Silicon Lake Improvement Club versus the State of Washington, the State of Washington is not a party to the case. We have four state officials sued in their individual capacities under Ex Parte Young. Your Honors, there's one claim against these state defendants. That's under the RCRA imminent and substantial endangerment citizenship provision. And the failure of proof that's been the focus up to this point applies equally to these state defendants because none of the state defendants are alleged to be doing anything actively to contribute phosphorus to Lake Silicon. It's rather alleged inaction on their part in relation to the alleged activities of the other defendants that's the basis of the plaintiff's claims. So to the extent that there's a failure of proof that relates to the other defendants, it applies equally to the state defendants who are even one step further removed from actual phosphorus getting to Lake Silicon. I have presented briefing and am prepared to present argument and answer questions related to two independent legal bases that would provide for the state defendants to be removed from this case, even beyond this failure of proof issue. Even if the Court were to find that there's an issue of genuine material fact related to whether there is causation or is phosphorus a solid waste, these legal arguments would provide a basis for summary judgment for the state defendants. I think at this point I will simply ask if the Court has any questions related to those arguments presented in the brief rather than belabor the argument at this point. I don't have questions about your briefing. I do have a general question, and you're maybe the most logical of the advocates to ask this question to. As I read Judge Bryan's opinion, he seemed to be going to some length to say that his rulings, that there was a failure to show the necessary elements on the various claims here, didn't preclude administrative relief or relief before any appropriate administrative body. And so, I mean, are there state agencies that are actively looking at the water quality or the issues of phosphorus in this lake? Yes, Your Honor. The State Department of Ecology, under its Clean Water Act authority on the state level, has the obligation to produce what's called a TMDL, a total maximum daily load related to streams that are on a certain list. It's called the 303D list of impaired waterways. Lake Silicon is on that list. The state is obliged to produce a TMDL, which will look at the issue, actually two issues. One is phosphorus with Lake Silicon. The other is copper as a result of nearly 50 years of applying copper sulfate to this lake. It's listed on the 303D list for both materials. The problem, I think, from the plaintiff's perspective, is that the state isn't moving quickly enough with respect to Lake Silicon, but there are water bodies across the entire state. The state goes through a process, an actual administrative process, to decide where to prioritize its resources in developing a TMDL for a certain water body. I think the problem the plaintiffs have and part of their motivation of bringing this case is that they want the state to move more quickly in that discretionary action. But isn't there some, I recall from another case, some maybe it's a fictional deadline for the state to establish these TMDLs? There's a, I believe it's a consent decree that provides a deadline, yes. And that hasn't come. Didn't pass long ago, did it? I believe the consent decree is a compliance order of sorts. And the deadline for providing those TMDLs has not yet come under that consent decree. So is Judge Bryan correct in his opinion that a resolution of the claims here will not restrict the remedies, if any, that the property owners on the lake have in the state's process? I would agree with that, yes. Okay. Thank you. Okay. I guess the felonies have argued, and now, Mr. Close, we were going to give you a couple more minutes. Two minutes. Thank you, Your Honor. Back on the causation argument, again, just to emphasize, an expert opinion, even on causation, is proper, does raise an issue of fact, making summary judgment improper. I cite the Voltheis Ninth Circuit case on DES liability and the California Department of Toxics case, citing the brief on CERCLA and RCRA liability. The only way to explain the trial court's decision is the court considered the testimony unpersuasive, didn't agree with the conclusions, and ruled against the plaintiffs. And that is not a proper basis on which to grant summary judgment. In the Beigler Ninth Circuit opinion, the Ninth Circuit says the determination is not to be made by a judge on motion for summary judgment, even if the trial judge is convinced plaintiffs will eventually lose. In Daubert, U.S. Supreme Court opinion, vigorous cross-examination and presentation of contrary evidence and careful instruction on burden of proof are the means of dealing with that kind of testimony. And in Joiner, also U.S. Supreme Court Justice Stevens, concurring and dissenting, Daubert quite clearly forbids trial judges to assess the validity or strength of an expert's scientific conclusions. On some of the other cases, Pierce County argued prescriptive easement. In the Bradley case, the court specifically rejected the application of prescriptive easement. In that case, then, the same rationale should apply here. In addition, under Washington statute, RCW 748-190 and the City of Benton case, nuisances are specifically cannot be established by any length of time of violations by statute and by case law. You cannot establish a nuisance by passage of time. And on the availability issue, whether a condition is available is a question of fact. And in this case, we submitted, well, we've been treating the late through 1992 successfully, also in 1996 and 97, and there are other methodologies that are set out in the record as to what you could do to fix this late. I'm out of time, but I wanted to address, if I may, the issue on the TMVL. There was a lawsuit over the State's non-action in that regard, and they were late and they were ordered to do it. They still didn't do it. EPA stepped in. And we still don't have a TMVL. And the TMVL only sets a standard. It doesn't change the condition of the late. And you're correct. I mean, the frustration of the plaintiffs is that the States have done nothing. And we argue that by deliberately knowing, I mean, they concede that this late presents an imminent and substantial endangerment to human health. They have to. And knowing that, they haven't done anything to either prevent the pollution of the late ongoing or to do anything to resolve the condition of the late that harms these plaintiffs. Okay. Thank you, Mr. Klaus. We thank all counsel for their spirited arguments. The Steel Lacoon Lake Improvement Club versus State of Washington. I hope Mr. Fitz won't be upset that I said that title. That case shall be submitted. Okay. And we will recess now. Thank you. All rise. This court for this session stands adjourned.
judges: Fernandez, Tashima, Gould